UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

v.

FREDERICK G. PAUL

CRIMINAL ACTION

NO. 16-131-JWD-RLB

**RULING AND ORDER**

This matter comes before the Court on the *Motion to Suppress Evidence (with Incorporated Memorandum)* (Doc. 17) filed by Defendant Frederick G. Paul. The Government opposes the motion. (Doc. 21.) An evidentiary hearing was held on February 22, 2017. (Docs. 23, 27.) Post-hearing briefs were filed by the parties (Docs. 28–30.) Further oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule as follows.

The Defendant's motion is denied. The Court finds the officers' testimony credible and believes that there was reasonable suspicion for the traffic stop based on (1) the Defendant's initial refusal to pull over immediately; (2) the plastic baggie that fell from the Defendant's waist or lap upon his exiting the vehicle; (3) the high crime area the officers were in; (4) the smell of marijuana coming from the Defendant and/or his vehicle; and (5) the officers' experience and training in all of these areas. The Court further concludes that this traffic stop was not excessive in duration given the officers' smelling of marijuana from the Defendant and/or his car.

Additionally, the officers had probable cause to search the vehicle. First, the burnt marijuana cigarette and stolen firearm were in plain view. Second, when the officers smelled marijuana coming from the Defendant and/or his car, they had probable cause to search the entire

vehicle, including the closed compartment near the steering wheel where the bulk of the illegal drugs were found. For all these reasons, the Defendant's motion is denied.

   I.   **Relevant Factual Background**

       **A. Introduction**

This motion centers on the legality of a traffic stop and search occurring on March 21, 2016, at around 6:45 p.m. near the Gardere Lane area of Baton Rouge. The main players are Corporal Dustin Sellars, Deputy DePedro, Mrs. Danielle Paul, and the Defendant Frederick Paul.

Corporal Sellars has been with the East Baton Rouge Parish Sheriff's Office for nine years, and he has been assigned to the Special Community Anti-Crime Team (SCAT) for seven years. (Hr'g Tr., 4-5, Doc. 27.) SCAT "go[es] into high crime neighborhood areas in East Baton Rouge Parish looking for illegal activities such as guns, drugs, [and] things of that nature." (Hr'g Tr., 4.) Sellars would patrol these areas in two-man units in marked EBRPSO vehicles and "do a lot of traffic stops. Pretty much any kind of violation we can get . . . anything we can do to contact people just to see what's going on." (Hr'g Tr., 5.) Sellars said further: "We patrol high crime areas and we pretty much -- any kind of violation we get on vehicles we usually use that as a chance to see who's inside the vehicle, talk to them, make sure they're in the right place, make sure they're not doing anything illegal." (Hr'g Tr., 23.) Sellars testified that he has performed "thousands" of traffic stops since 2010 and has made "probably around 800" narcotics arrests. (Hr'g Tr., 6.)

Deputy DePedro has been employed by the EBRPSO for almost nine years. (Hr'g Tr., 33.) He has been with the SCAT Division for about a year. (Hr'g Tr., 33.) As of the date of the events in question, DePedro had conducted more than one hundred traffic stops. (Hr'g Tr., 37.)

### B. The Traffic Stop

On March 21, 2016, Sellars was patrolling with DePedro in the Gardere Lane area, a "rundown area" with "a lot of vacant houses, apartment complexes, and stuff like that." (Hr'g Tr., 6-7.) Around 6:45 p.m., Sellars was traveling on Gardere Lane behind a red Volkswagen Beetle when he observed the Volkswagen make a right turn from Gardere to Coy without using a turn signal. (Hr'g Tr., 8.) From Sellars' training, he knew this was a violation of Louisiana law. (Hr'g Tr., 8.) Based on that violation, Sellars and DePedro initiated a traffic stop by turning on their lights and sirens. (Hr'g Tr., 9-10.)

The officers initiated the traffic stop at Coy and Seaboard. (Hr'g Tr., 10.) Defendant did not pull over immediately but went into an apartment complex down the road on Coy. (Hr'g Tr., 10.) The Volkswagen traveled "probably over 30 seconds" with "plenty of opportunity to pull over." (Hr'g Tr., 22.) Sellars testified that this concerned him because: "[b]ased on [his] training and experience, when people refuse to stop they're usually trying to hide things or weapons, illegal narcotics, stuff like that." (Hr'g Tr., 11.)

After the Volkswagen came to a stop, the officers exited their unit, and, as they were doing so, the Defendant immediately jumped out of the driver's side. (Hr'g Tr., 12-13, 24.) Sellars testified:

> Normally, from my experience and training, people who get out, they don't want me to get to the vehicle because they're most probably trying to hide something; they don't want me to smell anything. Also, it's kind of a concern for my safety, because why are they approaching me now. I haven't ordered you to come back to me. Normally they just stay in the vehicle.

(Hr'g Tr., 31.)

Sellars also stated that, "When [Defendant] exited the vehicle, we observed a clear, plastic baggy fall from around his waist area onto the ground." (Hr'g Tr., 14.) Sellars said that

3

he was familiar with this type of baggy and that "normally people use that to package illegal narcotics such as marijuana and stuff like that." (Hr'g Tr., 14.)

Additionally, as the officers were walking up to address the Defendant and passenger, they "got a strong odor of marijuana, so [they] immediately detained the [Defendant]" but not the juvenile passenger. (Hr'g Tr., 14.) Sellars stated that he was familiar with marijuana and has encountered it "just about every day" in his nine years of law enforcement experience, both in its raw form and burnt. (Hr'g Tr., 14.) Here, the marijuana smell was burnt and coming from the vehicle. (Hr'g Tr., 14-15.) According to Sellars, the odor was coming from Defendant's person as well. (Hr'g Tr., 24.) Sellars was probably ten feet away from the vehicle when he smelled it. (Hr'g Tr., 25.)

### C. The Search of the Vehicle

After putting the Defendant in the back of the patrol unit, Sellars conducted a search of the vehicle. (Hr'g Tr., 15-16.) There was a burnt marijuana cigar on the center cup-holder and a weapon on the back seat. (Hr'g Tr., 16.) Sellars said that the burnt marijuana cigarette and the firearm were in plain view. (Hr'g Tr., 27.) As to the cigarette, Sellars said that he smelled it, could tell it was marijuana, and that, "as you got closer to the vehicle it became stronger and stronger." (Hr'g Tr., 16.) As to the firearm, Sellars determined that the weapon was an AR-15 assault rifle. (Hr'g Tr., 16.) He also called the serial number to their criminal investigation unit, and he determined it was stolen. (Hr'g Tr., 17.)

While Sellars was checking the serial number and securing the weapon, Danielle Paul, the Defendant's wife, came out of the residence and told Sellars that the weapon was hers and that she paid $300 for it. (Hr'g Tr., 17.) She was advised of her rights and placed in handcuffs.

(Hr'g Tr., 17-18.) Sellars testified that she was completely uninvolved in the traffic stop until she approached. (Hr'g Tr., 18.)

Further, in the Volkswagen, there was a small compartment on the left side of the steering wheel "like a stock compartment" that opened up "like a smaller glove box." (Hr'g Tr., 18.) Sellars opened the box by pressing a button and found while searching the Beetle a "large bag of narcotics; heroin, crack, powder, cocaine, ecstasy." (Hr'g Tr., 18-19.) These items were not in plain view but were in a sealed compartment. (Hr'g Tr., 28.)

### D. DePedro's Account

Deputy DePedro substantiated much of Sellars' account, with minor variations. Specifically, DePedro confirmed the Defendant's failure to use a turn signal, the Defendant's failure to come to an immediate stop, the concern this caused, the Defendant's immediate exiting of his vehicle, the clear plastic baggy hitting the ground and the significance of the plastic baggie, and the smell of burnt marijuana and DePedro's similar familiarity with the marijuana from training and "constantly being around it." (Hr'g Tr., 35–39, 42–43.) DePedro did say that the marijuana was coming more from the person than from the vehicle. (Hr'g Tr., 40–41, 46–47.) But, based on DePedro's training and experience, DePedro believed that the Defendant had been smoking marijuana in the vehicle. (Hr'g Tr., 41.) DePedro also said that the baggy "seemed to be falling out of the vehicle. It was -- it seemed it was on his lap and when he stood up I saw it fall out." (Hr'g Tr., 46.)

DePedro also explained how, in a normal traffic stop, he'd walk up to the person, get their license, run their insurance and registration, and do a check for warrants. (Hr'g Tr., 40.) Here, a warrant check was done, and the Defendant had one warrant for three charges. (Hr'g Tr.,

40.) If DePedro found somebody with three outstanding warrants, generally he would be placed under arrest. (Hr'g Tr., 40.)

DePedro was not involved in the search of the vehicle though. (Hr'g Tr., 41.) While Sellars searched the vehicle, DePedro and Defendant were physically in the EBRPSO cruiser. (Hr'g Tr., 46.)

### E. Danielle Paul's Story

Danielle Paul, the Defendant's wife, also testified. She stated that, on the day in question, she saw her husband pull up to the apartment complex followed by two police officers. (Hr'g Tr., 49.) The officers' lights or sirens were not activated. (Hr'g Tr., 49.) She said that, when her husband exited the vehicle, he asked what the problem was, and the officers told him to walk to the car and put his hands on the hood of the car. (Hr'g Tr., 49–50.) Then, she could not hear the conversation because the officers told her to back up. (Hr'g Tr., 50.) She did not see a plastic baggy fall out of the car, and she did not smell marijuana. (Hr'g Tr., 50.)

On cross examination, Danielle Paul admitted that she did not see the traffic violation. (Hr'g Tr., 52.) She told the officers that the firearm in the vehicle was hers, and she said the same at the hearing. (Hr'g Tr., 52.) She stated that she bought the weapon, though she did not remember from whom. (Hr'g Tr., 52.) She also said she paid $200 for the weapon, though it sold at retail for $1,800. (Hr'g Tr., 53.) She did not know the gun was stolen, and she did not know how the gun got in the car. (Hr'g Tr., 53.) She also did not know what kind of ammunition the weapon uses; she "never bought ammunition for it" and had never shot it. (Hr'g Tr., 55.) When asked if she knew how to use it, "like, how to load it up or shoot it and stuff like that?", she replied, "I was going to learn." (Hr'g Tr., 55.)

She also admitted to knowing that her husband was a felon and that he was not allowed to have a gun. (Hr'g Tr., 53–54.) She stated: "But I thought because it was mine that he -- it wasn't his. So I didn't -- that part was kind of misunderstood for me." (Hr'g Tr., 54.) She said this even though the Defendant was in the car with the gun and she was not. (Hr'g Tr., 54.)

## II. Legality of the Traffic Stop

The Court first finds that the traffic stop was lawful. The Fifth Circuit analyzes the constitutionality of traffic stops under the standard articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). *United States v. Berry*, 664 F. App'x 413, 418 (5th Cir. 2016) (per curiam). *Terry* articulated a two-part test, which asks: (1) whether the officer's action was "justified at its inception," and (2) whether the officer's subsequent actions were "reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20).

Defendant conceded that the stop was justified at its inception,[1] so the Court will focus on the second *Terry* issue. "Under the second prong of the *Terry* test, . . . the question before the court is whether [the officers'] actions after [they] legitimately stopped the [car] were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). "This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id*. (citations omitted). In evaluating *Terry* stops, "district courts [are required] to consider the facts and circumstances of each case, giving due regard to the experience and

---

[1] *See* Doc. 29 at 1 ("Based on the testimony provided at the hearing on the motion to suppress, defendant Paul accepts that officers had probable cause to believe that Paul made a turn in his vehicle without signaling. (Tr. p. 8. See, La. R.S. 32:104 ('Whenever a person intends to make a right or left turn which will take his vehicle from the highway it is then traveling, he shall give a signal of such intention . . . .').")

7

training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." *Id.* The Court must "consider each of [the relevant] factors in turn" and "consider whether these factors constitute specific and articulable facts which, when considered along with whatever reasonable inferences may be drawn from them, would allow a reasonable person to suspect that [the Defendant] was engaging in illegal activity." *Lopez-Moreno*, 420 F.3d at 433.

Here, the Court finds that the traffic stop was supported by reasonable suspicion. First, the Court accepts and believes the testimony of Sellars and DePedro. Each had about nine years of experience with the EBRPSO, and Sellars had about seven years of experience with SCAT. Sellars testified that he and DePedro were patrolling the Gardere Lane area, and the Court infers from the evidence that this was a high crime area.[2] While patrolling, they observed the Defendant failing to use a turn signal. The officers activated their lights and sirens, but the Defendant did not pull over immediately; this caused the officers concern based on their experience. Further, both officers stated that they noticed a plastic baggie fall from the Defendant's waist area or lap when Defendant exited his vehicle, and both said that they knew from their experience that such bags are normally used to package illegal narcotics.

The Court finds *United States v. Jolly*, 368 F. App'x 17 (11th Cir. 2010) (per curiam) analogous. There, the Eleventh Circuit found that there was reasonable suspicion to conduct a traffic stop when the defendant was handed a clear plastic bag on a weekday morning in a high-crime area, even though (1) the officer did not know what was in the plastic baggie, (2) the

---

[2] Sellars testified that he was patrolling with DePedro in the Gardere Lane area, which was a "rundown area" with "a lot of vacant houses, apartment complexes, and stuff like that." (Hr'g Tr., 6-7.) Sellars stated further that SCAT "go[es] into high crime neighborhood areas in East Baton Rouge Parish looking for illegal activities such as guns, drugs, [and] things of that nature." (Hr'g Tr., 5; *see also* Hr'g Tr., 23 ("We patrol high crime areas. . .").) Thus, though there is no direct testimony on point, it is reasonable for the Court to infer that the Gardere Lane area is also a high crime area.

8

officer had no information about the defendant or the other individual to suggest that a drug transaction occurred, and (3) the officer "saw nothing else to indicate that a crime occurred." *Id.* at 18–19.

The same reasoning applies here. The plastic baggie and the high crime area provided reasonable suspicion for the continued duration of the traffic stop. If there was reasonable suspicion in *Jolly*, then there certainly was in this case.

Second, both officers smelled marijuana. The law in the Fifth Circuit is clear: if officers smell marijuana coming from inside the vehicle, they have probable cause to search the vehicle. *See United States v. Lork*, 132 F. App'x 34, 35-36 (5th Cir. 2005) (per curiam) (holding that, after conducting lawful traffic stop for speeding, officer detected odor of marijuana emanating from defendant's vehicle, thereby creating probable cause to search vehicle); *United States v. Reed*, 882 F.2d 147, 149 (5th Cir. 1989) (detection of marijuana odor emanating from vehicle provides law enforcement with probable cause to search vehicle); *United States v. Henry*, No. 15-26, 2015 WL 6479029 (M.D. La. Oct. 27, 2015) (deGravelles, J.), *aff'd*, 853 F.3d 754 (5th Cir. 2017) (officer detected marijuana odor emanating from car after lawful traffic stop for minor traffic infraction; odor provided probable cause to search car) (citing *Reed*, 882 F.2d at 149; *United States v. Hahn*, 849 F.2d 932, 935 (5th Cir. 1988); *United States v. Sawyer*, 849 F.2d 938, 940 (5th Cir. 1988)).

The Court also finds that the stop was not excessively long. Concerning the length of the stop, in *Berry*, the Fifth Circuit explained that, " '[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.' " *Id.*, 664 F.

9

App'x at 420 (quoting *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985)). Thus, in *Berry*, the Fifth Circuit found that, under the circumstances of that case, the officers acted diligently and did not extend the search longer than necessary when, at most, two officers searched a vehicle at any given time for forty-five minutes, the majority of which time was spent "meticulously going through the plethora of objects in the truck bed." *Id.* The *Berry* court found probable cause did not dissipate over the first forty-five minutes "[g]iven the nature of the object for which officers were searching—illegal narcotics—and the fact that probable cause permits officers to search 'every part of a vehicle which may conceal the object of the search[.]" *Id.* at 421 (citation omitted); *see also United States v. Hernandez*, 518 F. App'x 270 (5th Cir. 2013) (per curiam) (cited by *Berry* and holding that probable cause did not dissipate after officers searched defendant's vehicle for about three hours).

Similarly, as the Fifth Circuit stated in *Lork*, "[b]ecause the police officer testified that he detected this odor [of marijuana] immediately upon approaching [defendant's] vehicle, any questions regarding the length of detention or consent to the search are irrelevant." *Id.*, 132 F. App'x at 35.

Applying *Berry* and *Lork*, the traffic stop in this case was not excessive in duration. The Court believes the officer's testimony that, as soon as they stopped the Defendant, he immediately exited the vehicle and a plastic baggy fell. As the officers approached, they smelled marijuana from Defendant's person and/or car. This gave the officers authority to search the vehicle. There is simply no indication from the testimony at the hearing that the officers did anything other than "diligently pursue[] a means of investigation that was likely to confirm or dispel their suspicions quickly[.]" *Berry*, 664 F. App'x at 420.

The Defendant's counterarguments fail. First, the only evidence rebutting the officer's account came from the Defendant's wife, and the Court found her account incredible, biased, and unbelievable. Second, the fact that there was no body camera or video evidence of the traffic stop does not entitle the Defendant to relief; here, the Court observed and heard the officers testified, and the Court believes their account of the events in question.

For all these reasons, Defendant's motion to suppress on this ground is denied.

### III. Legality of the Search

For the same reasons, the Court finds that the officers had probable cause to search the vehicle. "It is well-established that warrantless searches of automobiles are permitted by the Fourth Amendment if supported by probable cause." *United States v. Ned*, 637 F.3d 562, 567 (5th Cir. 2011) (citing *United States v. Seals,* 987 F.2d 1102, 1107 (5th Cir.1993)). Under the "automobile exception," "in cases where there was probable cause to search a vehicle 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained.*" *Maryland v. Dyson*, 527 U.S. 465, 466–67, 119 S. Ct. 2013, 2014, 144 L. Ed. 2d 442 (1999) (per curiam) (emphasis in original) (quoting *United States v. Ross*, 456 U.S. 798, 809, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982)).

"A warrantless search is permissible under the automobile exception if (1) the officer conducting the search had 'probable cause to believe that the vehicle in question contain[ed] property that the government may properly seize'; and (2) exigent circumstances justified the search." *Berry*, 664 F. App'x at 420 (quoting *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005) (alteration in original) (quoting *United States v. Reyes*, 792 F.2d 536, 538 (5th Cir. 1986))). Concerning the second requirement, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the

vehicle without more." *Dyson*, 527 U.S. at 467, 119 S. Ct. at 2014 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 116 S. Ct. 2485, 135 L. Ed. 2d 1031 (1996) (per curiam)); *United States v. Sinisterra*, 77 F.3d 101, 104 (5th Cir. 1996) ("a finding of exigent circumstances other than the fact of the automobile's potential mobility" is not required for the automobile exception to apply).

Concerning the first requirement, "[u]nder the 'automobile exception' to the warrant requirement, officers may conduct a search if they have probable cause to believe that the vehicle contains contraband or evidence of a crime." *Ned*, 637 F.3d at 567 (citing *United States v. Buchner,* 7 F.3d 1149, 1154 (5th Cir.1993)); *Sinisterra,* 77 F.3d at 105 ("if, under the totality of the circumstances, officers have probable cause to believe that a vehicle contains contraband, they are authorized to search [the vehicle] without a warrant." (citations omitted)). "Probable cause exists when facts and circumstances within the knowledge of the arresting officer would be sufficient to cause an officer of reasonable caution to believe that an offense has been or is being committed." *Ned*, 637 F.3d at 567 (quoting *United States v. Carrillo–Morales,* 27 F.3d 1054, 1062 (5th Cir. 1994)). "A determination of probable cause is also based on the totality of circumstances and must be predicated on more than a 'bare suspicion.'" *United States v. Guerra*, 605 F. App'x 295, 297 (5th Cir. 2015) (per curiam) (citing *United States v. Banuelos-Romero*, 597 F.3d 763, 768 (5th Cir. 2010)).

Turning to this case, the Court finds that there was probable cause to search and seize all of the evidence in question. First, the officers clearly had probable cause to seize the marijuana cigar and firearm because these items were in plain view. *See United States v. Anaya-Sanchez*, 242 F. App'x 215, 216–17 (5th Cir. 2007) (per curiam) ("The bundles of marijuana on display between the truck's seats themselves established all the probable cause needed to seize them.

Consequently, no 'warrant was required to open the . . . door and seize the items within.' " (quoting *Colorado v. Bannister*, 449 U.S. 1, 2, 101 S. Ct. 42, 66 L. Ed. 2d 1 (1980))); *United States v. Rogers*, 719 F.2d 767, 771 (5th Cir. 1983) ("Once the vehicle was stopped, the officer observed black plastic bags containing marihuana in the back seat. Seeing these packages of marihuana in plain view, he had probable cause to seize the contraband." (citing *Texas v. Brown*, 460 U.S. 730, 731, 103 S. Ct. 1535, 1542, 75 L. Ed. 2d 502 (1983)).

Second, as stated above, the smell of marijuana gave the officers probable cause to search the entire vehicle. In addition to the above cases, the Court wishes to note *United States v. McSween*, 53 F.3d 684 (5th Cir. 1995). There, the officer had consent to search the inside passenger compartment of the car. *Id.* at 686. While there, the officer smelled burned marijuana. *Id.* He discovered nothing in the ashtray or anywhere else in the passenger compartment. *Id.* He then looked under the hood of the car. *Id.* Under the hood was a red rag sticking out of a hole in the car's fire wall. *Id.* at 685. The officer removed the rag and saw in the hole what appeared to be a brown plastic bag. *Id.* The officer fingered the bag, and it felt like it contained a "small bale" of marihuana. *Id.* at 685–86. The officer arrested the defendant. *Id.* at 686. Later, officers looked in the hole and found a bag of marijuana and a shoulder sling of crack cocaine. *Id.*

On appeal, the defendant argued that the district court erred in denying his motion to suppress. *Id.* Rejecting the argument, the Fifth Circuit held that that the marijuana smell, the officer's experience, and his knowledge of the defendant's four previous arrests on narcotics charges justified a finding of probable cause to search the entire vehicle. *Id.* The Fifth Circuit stated, "Indeed, the smell of marijuana alone may be ground enough for a finding of probable cause, as this Court has held many times." *Id.* at 686–87 (citations omitted)).

The Defendant argued that, even with the smell of marihuana, the officers only had

probable cause to search the passenger area, where the smell was detected. The Fifth Circuit stated:

> We disagree. It is well settled that, in a case such as this, the detection of the odor of marihuana justifies "a search of the entire vehicle." *Reed,* 882 F.2d at 149. As the Supreme Court stated in *Ross,* "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." 456 U.S. at 825, 102 S. Ct. at 2173. *See also United States v. Johns,* 469 U.S. 478, 482, 105 S. Ct. 881, 884, 83 L.Ed.2d 890 (1985). The Court further observed that, if there is probable cause to suspect that the vehicle contains contraband, then the search may extend not only to closed containers, but also to a "car's trunk or glove compartment." *Ross,* 456 U.S. at 823, 102 S. Ct. at 2172. The same reasoning applies to the area under the hood, where drugs may also be concealed. We therefore reject [defendant's] contention that [the officer] lacked probable cause to search under the hood of his rental car.

*Id.* at 687.

Similarly, in *Reed*, the Fifth Circuit held that "the detection of the odor of marijuana justified a search of the entire vehicle, including the locked compartment that was a likely place to conceal contraband." *Id.*, 882 F.2d at 149 (citations omitted).

In sum, once the officers smelled marijuana, they had probable cause to search the entire vehicle, including anywhere that they believed contraband could be hidden. Thus, the search of the entire vehicle, including the closed compartment near the steering wheel, was permissible. As a result, the Defendant cannot prevail on his motion, and it is denied.

## IV. Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Suppress Evidence (with Incorporated Memorandum)* (Doc. 17) filed by Defendant Frederick G. Paul is **DENIED**.

Signed in Baton Rouge, Louisiana, on May 19, 2017.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**